AMERICAN BONDING & TRUST CO. v. BALTIMORE & O. S. W. R. CO.

(Circuit Court of Appeals, Sixth Circuit. July 29, 1903.)

No. 1,125.

1. ASSIGNMENTS—VALIDITY—CONTRACTS ASSIGNABLE.

The rule settled by the decisions of the Supreme Court is that a contract by which one party became obligated to the other is assignable by the latter unless there is something in the terms or nature of the contract which evidences an intention of the parties that it should not be assignable.

2. SAME—CONTRACT WITH RECEIVERS.

Receivers for railroad property, appointed pending the foreclosure of mortgages thereon, under authority from the court entered into a contract for certain betterments to be paid for from the proceeds of receivers' certificates, which were made a first lien on the property and its earnings, and the contractor gave bond with a surety for the due performance of the contract. Pending the work the property was sold under the foreclosure decree, and conveyed to the purchaser, subject to all contracts made and liabilities incurred by the receivers, for the protection of which the court reserved jurisdiction over the property. The contract and bond were also assigned by the receivers to the purchaser, which performed the contract on its part until the work was abandoned by the contractor. Held, that there was nothing in the nature of the contract indicating an intention that it should not be assignable by the receivers, but that, in view of the fact that they were known to be officers of the court temporarily in charge of the property, which was likely to be sold at any time, and that the court had power to protect the rights of the contractor, as it in fact did, it must be presumed, in the absence of any provision to the contrary in the contract itself, that it was the intention that it should be assignable in case of a sale of the property; that the assignment was, therefore, valid, and vested the assignee with the right to maintain an action on the bond given by the contractor.

3. SAME.

A clause of such contract, giving the receivers the right to cancel the same at any time at their option, did not indicate an intention that it should not be assignable, but should be canceled in case of a sale of the property.

---

¶ 1. See Assignments, vol. 4, Cent. Dig. § 25.

4. SAME—GUARANTY CONTRACT.

The fact that the bond of the contractor was a contract of guaranty did not render its assignment by the obligees invalid, since it was a guaranty of performance of a contract already in existence, and the terms of the obligation were not changed, nor the surety's liability increased by the assignment.

5. SAME.

The fact that such bond was executed by a bonding company engaged in the business of making guaranty obligations for profit, and that such contracts are held to be in a certain sense insurance contracts, did not render it nonassignable by the obligee.

6. CONTRACTS—REMEDY FOR BREACH—PROVISION GIVING OPTION TO CANCEL.

A provision of a contract for the construction of railroad work, giving the engineer in charge power to annul the contract by giving notice in case the work was not performed by the contractor as required thereby, and that in such case the contract should become null and void, and any sums due the contractor should be forfeited as liquidated damages, does not provide an exclusive remedy for breach of the contract by the contractor; and especially where a bond for the faithful performance of the work was also required and given, and where the power was not exercised, but the work was abandoned by the contractor, such provision does not preclude an action on the bond to recover damages.

7. SAME—ACTIONS FOR BREACH—QUESTIONS FOR JURY.

The question whether a change in the plans and specifications of railroad work to be performed by a contractor under a right reserved to make changes was a material one, not within the contemplation of the parties when the contract was made, and one which so increased the burden of the contract as to justify the contractor in refusing to perform it, is one of fact, and not of law, and its decision was not involved in a ruling of the court refusing to direct a verdict for defendant in an action to recover damages for breach of the contract by the contractor, nor in one refusing to exclude evidence relating to that portion of the work.

8. SAME—RAILROAD WORK—CONSTRUCTION.

Where a contract for railroad work provided that the engineer in charge might, in his discretion, annul the same "as to any one or more sections of the work without releasing the contractor from his contract on other portions of the work," a change by the engineer in the plans and specifications for the work on a certain section, which was of such a radical character as to be outside the power reserved in the contract, and as to justify the contractor in refusing to do the work on such section, did not release him from the obligation to do the other portions of the work.

9. SAME—ACTION FOR BREACH—EVIDENCE.

In an action against a contractor for damages for failure to perform a contract for railroad work, which provided that estimates of the work done should be made by the "engineer in charge of construction," subject to revision by the engineer "of maintenance of way," estimates made by a resident engineer in immediate charge of the work under direction of the engineer of construction, and as such approved by the engineer of maintenance of way, were, in effect, those contemplated, and are admissible in evidence.

10. SAME—CONSTRUCTION—AGREEMENT FOR CARRIAGE OF MATERIALS.

A provision of a contract for railroad work, by which the company agreed to transport all materials used by the contractor at a specified rate of charge, in the absence of any express provision otherwise must be construed to require the carriage of such materials only to the nearest station to the place where used.

11. SAME—ACTION FOR BREACH—INSTRUCTIONS.

Instructions and rulings of the court on the admission of evidence in an action to recover damages for breach of contract considered and approved.

12. APPEAL—REVIEW—INSTRUCTIONS.
    Where the charge of the court on a particular matter was not excepted
    to, and no further instruction was requested, it cannot be assigned for
    error.

In Error to the Circuit Court of the United States for the Southern District of Ohio.

W. L. Granger and J. W. O'Hara, for plaintiff in error.
Judson Harmon, for defendant in error.

Before LURTON and SEVERENS, Circuit Judges, and COCHRAN, District Judge.

COCHRAN, District Judge. This writ of error is to a judgment of the lower court in an action brought therein by the defendant in error against the plaintiff in error to recover on a guaranty bond executed by the latter April 18, 1899. At that date a suit was pending in said court, brought by the Farmers' Loan & Trust Company against the Baltimore & Ohio Southwestern Railway Company, to foreclose certain mortgages on the latter's railroad, extending from Belpre, Ohio, through that state and the states of Indiana and Illinois, to East St. Louis, Ill., and its branches, one of which extended to Louisville, Ky., and suits ancillary thereto were pending in the Circuit Courts of the United States for the districts of Indiana and Kentucky and the Southern District of Illinois. In those suits Judson Harmon and Joseph Robinson had been appointed receivers of said railroad and its branches, and they had taken possession thereof, and were then engaged in operating them. Prior to the institution of said suits said railway company had made beneficial contracts for the purchase of a large number of cars, locomotives, steel rails, continuous rail points, and bridges, some of which cars and bridges had been delivered, in pursuance to plans which contemplated also the laying of a second track from Cochran to Milan, in the state of Indiana, and a change of grade at Skillet Fork Creek, near Iuka, in the state of Illinois. After their appointment, and prior to the date of the execution of said guaranty bond, said receivers, with the consent of the holders of about 90 per cent. of the bonds secured by said mortgage, had been authorized by said courts to carry out said contracts, to make said improvements, to borrow sufficient money for those purposes, and to issue certificates therefor, which should be a first lien on the property in their possession and its earnings. In pursuance of this authority, on said date, to wit, April 18, 1899, they entered into a contract with the Globe Construction Company, whereby said company promised to do the grading, masonry, and track-laying for said second track, and to change said grade, and prepare it for metal viaducts, bridges, and ballasting, the work to be done under the immediate supervision of an employé of the receivers, called "engineer in charge of construction," in many particulars according to his directions, and in a few according to the directions of a superior employé, called "engineer of maintenance of way," to be estimated monthly by the former, whose estimates were subject to revision and alteration by the latter, but were otherwise final and conclusive, to be begun in 10 days thereafter, and to be completed December 1, 1899; and whereby, further,

said receivers promised to pay said company certain prices for said work according to a certain classification, 90 per cent. whereof, according to said monthly estimates, was to be paid monthly, and the remainder at the completion of the work. At the same time, and in consideration thereof, said Globe Construction Company and the American Bonding & Trust Company, plaintiff in error, and defendant in the lower court, executed to them a joint and several bond in the sum of $45,000, whereby they guarantied the faithful performance by said construction company of its part of said contract, which bond is the bond to recover on which the action in the lower court was brought. Subsequent thereto, on May 27, 1899, a decree of foreclosure and sale was entered in said suits, whereby the property covered by said mortgages and in the possession of said receivers was ordered to be sold to pay the indebtedness secured thereby, subject to the payment by the purchaser of any indebtedness incurred by the receivers properly chargeable against said property, and such other claims as the court had theretofore or might thereafter decree to be prior and superior to said mortgages, or either of them, on said property, or any part thereof, to enforce payment of which jurisdiction over the property was reserved, and the purchaser to assume and carry out any contracts made by the receivers. A special master commissioner was appointed to make the sale. In pursuance of this decree sale was made of said property July 10, 1899, to Edward R. Bacon, George Hoadly, Jr., and J. Chauncey Hoffman, which sale was reported July 11, 1899, and confirmed July 20, 1899. The decree of confirmation provided that the purchasers should have the right to assign their interest as an entirety or in parcels, and upon payment of the purchase price the commissioner of sale should execute deeds of conveyance to the purchasers or the persons or corporations to whom they should assign their interest, and the receivers should deliver to them possession of the property and business in their possession and control, the purchasers or their assigns to take title and possession of the property subject to all liens and charges which might thereafter be found and adjudged against it, and to the jurisdiction and power of the court at any time to retake and resell said property in case future orders for the payment of money by said purchasers or their assigns in discharge of said liens and charges should not be complied with. Said individual purchasers did not purchase said property in their own right, but in pursuance of a plan of reorganization formed by the bondholders of said railway company, and as a committee acting for them, which plan contemplated the vesting of said property in a new corporation to operate it. The machinery by which this portion of the plan was carried out was this: Separate corporations were formed in the states of Ohio, Indiana, and Illinois. Said purchasers assigned their interest in so much of said property as lay in the state of Illinois to the Illinois corporation, and in so much thereof as lay in the states of Indiana and Kentucky to the Indiana corporation. The commissioner of sale made deeds of conveyance in accordance with said assignments, and for so much of said property as lay in the state of Ohio, to said purchasers. The Illinois corporation conveyed the property so conveyed to it to the Indiana cor-

poration and the purchasers that so conveyed to them to the Ohio corporation; and the Indiana and Ohio corporations consolidated and became a single corporation under the name of the Baltimore & Ohio Southwestern Railroad Company, plaintiff below, which thereby acquired title to the entire property. All this was accomplished by July 31, 1899, and thereupon said receivers delivered possession of said property and all the business in their possession and control, including said contract and bond, to said railroad company. August 1, 1899, the receivers executed a formal written assignment of the contract and bond to the company. It is by virtue of these proceedings and this assignment that plaintiff asserted title to said bond and the right to sue on it.

Before this, to wit, on May 28, 1899, the day after the entry of the decree of foreclosure and sale, the construction company began the Indiana work, and at the time when said railroad company acquired title and possession of the property and said assignment was made it had done about 10 per cent. of that work. It continued to work there after said transfer the same as if no change had taken place. The persons who had been in the employ of the receivers as engineer in charge of construction and engineer of maintenance of way, respectively, were employed by plaintiff in said positions, and so continued during the times hereinafter mentioned. The work on said second track progressed, and monthly payments were made to and on account of the construction company until about January 18, 1900. At that date the Indiana work was still uncompleted, and the Illinois work had never been begun, though the time when said company had promised to complete the work at both places, to wit, December 1, 1899, had passed. The failure so to do was due largely to the fault of the construction company, but also to an increase in the amount of work to be done over that in contemplation when the contract was made, but within its terms. A little over 50 per cent. of the Indiana work so contemplated was then done. In this condition of things the construction company abandoned the work, and plaintiff, by reason thereof, was compelled to and did complete it at both places. The action brought by it against the defendant on the guaranty bond was to recover the damages sustained by it because of the failure of the construction company to comply with its contract, to wit, the increased cost of doing the work contracted for over the contract price. Plaintiff claimed that the increased cost thereof exceeded the amount of the bond, and it therefore sued for the whole amount. The case was tried by a jury. It returned a verdict in favor of plaintiff for the sum of $36,427.98, upon which the judgment complained of herein was entered. Other provisions of said contract and other facts in relation to what was done under it will be stated further on.

Plaintiff in error assigns as error quite a number of rulings of the lower court, and they may be conveniently classified as those which involved questions affecting plaintiff's right to recover at all and those which involved questions affecting the amount which it had a right to recover.

1. Of the first class the principal one is the refusal of the court to give a peremptory instruction to the jury to find for the defendant

asked at the close of all the evidence, and it is unnecessary to refer to other rulings which involved the same question, or questions which it raised.   It involved two questions.

(a) One of these related to the assignability of the bond sued on. Plaintiff in error contends that it was not assignable, and that, therefore, defendant in error had no right to sue on it.   It is not contended by it that the proceedings in said suit subsequent to the execution of said bond and said written assignment did not have the effect of assigning it to defendant in error, if it was assignable at all.   Indeed, there is no room for such a contention.   Nor is it contended by it that, if such was the case, the defendant in error did not have a right to bring the action in the lower court in its own name as plaintiff. At common law it is true it would not have had such a right.   Glenn v. Marbury, 145 U. S. 499, 12 Sup. Ct. 914, 36 L. Ed. 790.   But in the state of Ohio, where the assignment took place, if at all, and where the action was brought, it is provided by statute that every action must be prosecuted in the name of the real party in interest.   2 Rev. St. Ohio (6th Ed.) § 4993.   And it is the settled interpretation of this provision by the Supreme Court of Ohio that whenever a thing in action is assignable the assignee may sue on it in his own name. Allen v. Miller, 11 Ohio St. 374.   This being so, defendant in error had the right to maintain the action in the lower court, though a federal court, in its own name, if the bond sued on was assignable. Arkansas Valley Smelting Co. v. Belden Mining Co., 127 U. S. 379, 8 Sup. Ct. 1308, 32 L. Ed. 246; Delaware County v. Diebold Safe & Lock Co., 133 U. S. 473, 10 Sup. Ct. 399, 33 L. Ed. 674; Glenn v. Marbury, supra.   The contention of counsel for plaintiff in error relates solely to the assignability of said bond.

In Pollock on Contracts, p. 201, it is stated that the origin of the rule that the benefit of a contract—i. e., the right of one party thereto to have the other perform an obligation on his part arising therefrom —could not be assigned at common law, so as to enable the assignee to sue in his own name for a breach thereof, was attributed by Coke to the "wisdom and policy of the founders of our law" in discouraging maintenance and litigation.   In opposition to this the author states:

"But there can be little or no doubt that it was in truth a logical consequence of the primitive view of a contract as creating a strictly personal obligation between the creditor and the debtor."

According to this conception of a contract, the relation created by it cannot be severed by either party thereto, the creditor or debtor, without the consent of the other.   It is as impossible for either to substitute another in his place as it is for him to change any other term of the contract.   This primitive view of a contract prevails no longer.   The treatment by courts of equity of such assignments, the judicial cognizance by courts of law of the usage of merchants in relation to bills of exchange rendering it a part of the common law, the passage of statutes making certain contracts assignable, the construction placed upon the statutes enacted in numerous jurisdictions requiring actions to be brought in the name of the real party in interest, and the conception of such rights as property and the possession thereof as ownership, account for its passing away.   But, notwithstand-

ing this, it is still possible that a certain contract may create such a relation between the parties thereto—a relation that cannot be severed by the creditor assigning to another his right to have the debtor perform his obligation. It will do so if it contains an express stipulation prohibiting such an assignment. In the case of Devlin v. Mayor, etc., of New York, 63 N. Y. 8, Judge Allen said:

"Parties may, in terms, prohibit the assignment of any contract, and declare that neither personal representatives nor assignees shall succeed to any right in virtue of it, or be bound by its obligations."

Such a stipulation in a contract with the state of Texas for the erection of its capitol building was upheld and enforced in the case of Burck v. Taylor, 152 U. S. 635, 14 Sup. Ct. 696, 38 L. Ed. 578. It was contended in that case, according to Mr. Justice Brewer, as follows:

"The contract in the possession of the contractor was his property, and the profits arising therefrom and any interest therein were as much the subject of disposal as any other property, and the only limitation was one for the benefit of the state, and could not be claimed by any subsequent assignee from the contractor."

In response to this contention he said:

"That contract, however, was as binding on the one party as on the other. The contractor assented to its terms precisely as did the state, and his promise was not to assign the contract in whole or in part, without the consent in writing of the state authorities. It was a promise which entered into and became one of the terms of the contract, and one which was binding, not only upon the parties, but upon all others who sought to acquire rights in it. It may be conceded that, primarily, it was a provision intended, although not expressed, for the benefit of the state, and to protect it from interference by other parties in the performance of the contract, to secure the constant and sole service of a contractor with whom the state was willing to deal, and to relieve itself from the annoyance of claims springing up during or after the completion of the contract in favor of parties of whose interest in the contract it had no previous knowledge, and to the acquisition of whose interest it had not consented. Concede all this, and yet it remains true that it was a stipulation which was one of the terms of the contract, and binding upon the contractor, and equally binding upon all who dealt with him."

It will also do it if it is a bilateral contract, and the counter obligation on the part of the creditor to the debtor is of such a nature that the reasonable inference therefrom is that it was the intention of the parties that it should be performed by the creditor, and no one else. Perhaps a more careful statement would be that in such a case the right cannot be assigned so as to compel the debtor to accept performance of that obligation from the assignee, and, if an attempt is made to so assign it, the assignment will be invalid. It is so stated in Bishop on Contracts, § 1182, where he says:

"An agreement involving personal trust in the party, or to be carried out by his personal skill, cannot be so assigned as to compel the other party to accept performance by the assignee, and pay him therefor."

If the rule here goes no further than this, there is nothing in the existence of such a counter obligation to prevent an assignment by a creditor of his right after he has performed that obligation, and thus

perfected his right, or, even before, if no attempt is made to shift the duty of performing it from himself to the assignee. Instances of where the counter obligation involved personal skill on the part of the creditor, and because of this it was held that the reasonable inference was that it was the intention of the parties that it be performed by him alone, and therefore he could not assign his right to another so as to compel the debtor to accept performance from the assignee, may be found in the recent cases of Sloan v. Williams, 138 Ill. 43, 27 N. E. 531, 12 L. R. A. 496; Edison v. Babka, 111 Mich. 235, 69 N. W. 499; Eastern Advertising Co. v. McGaw, 89 Md. 72, 42 Atl. 923. An instance of where it involved personal credit, and the same significance and effect was given to it, may be found in the case of Arkansas Valley Smelting Co. v. Belden Mining Co., supra. There a company engaged in the business of mining carbonate lead ore at Red Cliff, Colo., entered into a contract with two individuals engaged as partners in the smelting business at Leadville, in said state, whereby it agreed to sell and deliver to said individuals 10,000 tons of ore at their works in Leadville, at the rate of at least 50 tons a day, beginning on completion of a railroad from Leadville to Red Cliff, the ore upon delivery to become at once the property of the purchasers, and whereby further the latter agreed to pay certain prices therefor at Leadville as each 100 tons of said ore so delivered was assayed by a disinterested and competent party, if the parties could not agree as to the proper assay thereof. Thereafter said railroad was completed, and said company began to and did make deliveries of ore under said contract, and, when not one-tenth of the amount agreed to be delivered had been delivered, one of said individuals—the other having theretofore withdrawn from the partnership—sold and conveyed the smelting works, and assigned the right under said contract to further deliveries to a corporation organized to carry on the smelting business at said works. Thereupon the mining company refused to make further deliveries to the smelting company under said contract, and an action was brought by the latter against the former to recover damages. It was held that no recovery could be had. Mr. Justice Gray, in delivering the opinion of the court, said:

"During the time that must elapse between the delivery of the ore and the ascertainment and payment of the price the defendant had no security for its payment, except in the character and solvency of Billings and Eiler. The defendant, therefore, could not be compelled to accept the liability of any other person or corporation as a substitute for the liability of those with whom it had contracted."

And again:

"The cause of action set forth in the complaint is not for any failure to deliver ore to Billings before his assignment to the plaintiff (which might perhaps be an assignable chose in action), but it is for a refusal to deliver ore to the plaintiff since this assignment. Performance and readiness to perform by the plaintiff and its assignors, during the periods for which they respectively held the contract is all that is alleged. There is no allegation that Billings is ready to pay for any ore delivered to the plaintiff. In short, the plaintiff undertakes to step into shoes of Billings, and substitute its liability for his. The defendant had a perfect right to decline to assent to this, and to refuse to recognize a party with whom it never contracted, as entitled to demand further deliveries of ore."

It is apparent that the ground upon which the assignment was held invalid in this case was that it attempted not only to transfer the right to future deliveries of ore, but to shift the duty of paying therefor to the assignee. As to the right of assignment by a creditor of an agreement to pay money and deliver goods, Mr. Justice Gray stated generally:

"At the present day, no doubt, an agreement to pay money or to deliver goods may be assigned by the person to whom the money is to be paid or the goods are to be delivered, if there is nothing in the terms of the contract, whether by requiring something to be afterwards done by him, or by some other stipulation, which manifests the intention of the parties that it shall not be assignable. But every one has a right to select and determine with whom he will contract, and cannot have another thrust upon him without his consent."

Another case in which the Supreme Court of the United States has held that an assignment was contrary to the intent of the parties to the contract, and therefore invalid, is that of Delaware County v. Diebold Safe & Lock Company, supra. That was the case of a partial assignment; but in Indiana, where the transaction took place and the suit was brought, the assignee, by valid assignment of a part of a contract, may sue thereon jointly with his assignor, or may maintain an action alone if no objection is taken by demurrer or answer to the misjoinder of the assignor. The question, therefore, was whether there had been a valid partial assignment. Meyers & Son had a contract with the board of commissioners of Delaware county, in said state, for the construction of a jail for said county, for which they were to be paid the sum of $20,000 in monthly payments, on the architect's certificate, reserving on each payment 20 per cent., to be paid on the completion and acceptance of the building. It was expressly agreed that the county should not in any manner be answerable or accountable for any materials used in the work, and that, if the contractors should fail to finish the work by the time agreed on, they should pay to the commissioners, as and for liquidated damages, the sum of $25 for every day the work should remain unfinished. The statutes of Indiana required the contractor in such a case to give bond, with sureties, for the faithful performance of his contract, and payment of all debts incurred by him in the prosecution of the work, and provided that any laborer or materialman having a claim against the contractor might sue upon the bond, which suit, or one against the contractor alone, was the only remedy they had according to the holding of the Supreme Court of Indiana. Meyers & Son executed such a bond. Thereafter they made a subcontract with the Diebold Safe & Lock Company, to do the ironwork necessary in the construction of the jail, and assigned to it $7,700 of the sum coming to them under the contract. Having done that work according to contract, said company brought an action against the board of commissioners to recover said sum, and one of the questions considered and determined by the Supreme Court of the United States when the case came before it was as to the validity of said assignment. It was held to be invalid. Mr. Justice Gray said:

"This case does not require us to consider whether an assignment of the entire contract for the construction of the jail would have been consistent

with the intention of the parties as apparent upon the face of the contract. or with the intention of the Legislature as manifested by the statutes under which the contract was made. The plaintiff claims under no such assignment. Those statutes and the judicial exposition of them by the Supreme Court of the state are quite inconsistent with the theory that the original contractors can, at their pleasure, and without the consent of the county commissioners, split up the contract, and assign it in parts, so as to transfer to different persons or corporations the duty of furnishing different kinds of material and labor, and the right of recovering compensation for such material and labor from the county commissioners."

As to assignment of contracts to pay money, he said generally:

"A contract to pay money may doubtless be assigned by the person to whom the money is payable, if there is nothing in the terms of the contract which manifests the intention of the parties to it that it shall not be assignable. But where rights arising out of contract are coupled with obligations to be performed by the contractor, and involve such a relation of personal confidence that it must have been intended that the rights should be exercised and the obligations performed by him alone, the contract, including both his rights and his obligations, cannot be assigned without the consent of the other party to the original contract."

These decisions of the Supreme Court of the United States are sufficient to furnish us with a rule as to the assignability by a creditor of his right to have the obligation of his debtor arising out of a binding contract between them, which can be applied to this case in determining whether the guaranty bond in question herein was assignable. That rule is that such a right is assignable unless there is something in the terms or nature of the contract, considered from the standpoint of the situation as it existed when the contract was made, that evidences that it was the intention of the parties thereto that it should not be assignable. For such a right to be assignable, absence of evidence of an intention that it should not be is sufficient. If there is no evidence of such intention, it is to be presumed that it was the intention of the parties to the contract that it should be assignable— i. e. that the creditor could substitute another in his place in the right to the performance of the obligation by the debtor—and that in this way, and to this extent, at least, the relation thereby created between them could be severed. If, on the other hand, there is evidence in the terms or nature of the contract so considered which evidences that it was within the contemplation and the intention of the parties that it should be assignable, so much the greater reason for holding that it was.

It remains to apply this rule to this case. It must be conceded at the outset that, if the application of this rule to the principal contract —i. e., the contract of construction—results in the conclusion that the right to have the construction company perform the work which it thereby promised to do was not assignable, then neither was the guaranty bond assignable. There would be enough in this alone to show that it was the intent of the parties thereto that it also should not be assignable. It is in order, therefore, first to apply the rule so deduced to that contract. It is certain that it contained no express stipulation prohibiting the receivers from assigning the right which they had to have the construction company perform its obligations arising therefrom. There is, however, a similarity between that contract and the

one involved in the case of Arkansas Valley Smelting Co. v. Belden Mining Co., in this: that in said contract of construction there was a counter obligation on the part of the receivers to pay for the work which the construction company promised to do after it was done. That obligation may be said, therefore, to have involved credit; whether personal or not will be indicated further on. Besides, the receiver's employés had much to do with regulating and determining the details of the work, and all to do with adding to or taking from that in contemplation when the contract was made, and with estimating the quality and quantity of that done as a basis of payment therefor. The possession of this power by the receiver's employés, and of the right to select the persons who should wield it by the receivers, may be regarded as involving considerable trust on the part of the construction company that neither would be exercised unfairly. But, on the other hand, there are facts which tend to show that, notwithstanding these evidences of personal confidence in the receivers, it was the intent of the parties to the contract that the receivers should have the right to assign the obligation of the construction company to do the work promised to be done by it, and the privilege of naming the persons who should occupy those positions, and at the same time of shifting to the assignee from themselves the duty of performing the counter obligation of paying therefor. In the first place, it was expressly provided in the contract that the construction company should perform the work itself, and that no subcontractors relieving it of the responsibility of a proper performance of the contract would be permitted, unless by the written consent of the engineer of maintenance of way; and, further, that the amounts of the monthly estimates should not in any manner be assignable or transferable, either by the act of the company or by operation of law, as a subsisting debt or liability of the receivers, until the final estimate should be made and become payable as therein provided.

The presence in the contract of these limited prohibitions against the company having the right to shift the duty of performing its contract to others, and of assigning its right to payment of the monthly estimates, makes the absence therefrom of a provision prohibiting an assignment by the receiver of said right and privilege, and a shifting of its duty to pay to another, quite significant. It shows that the parties' minds were directed to the matter of severance, in whole or in part, of the relation between them growing out of the contract, and such severance was prohibited only to the extent stated. In addition to this is the fact that, when the contract was entered into the possession and control of the property by the court was only temporary; i. e., until it should be in position and might deem it proper to sell and deliver possession thereof to the purchaser. It must have then been within the contemplation of the parties at that time that it was possible, if not probable, that long before the time for completion of the work agreed to be done (as in fact turned out to be the case) the property would be sold, and possession and control thereof delivered to the purchaser; or in other words, that the property with which the contract had to do would pass into other hands pending its completion. This, in connection with the absence of a stipu-

lation prohibiting an assignment heretofore referred to, must be regarded as sufficient to show that it was the intention of the parties that, if that event should happen before that time, the right to have the contract completed, with the privilege of naming the employés having such powers, if it would not pass with the property without more, should be assignable along with it to the purchaser, and to require that the elements of personal confidence heretofore referred to be denied the significance that might otherwise in a different state of case be given to them. It is at least sufficient to show that it was the intention of the parties that said right should be assignable to the purchaser, if no attempt was made, in connection with the assignment, to take away from the construction company that upon which it relied for payment when it entered into the contract. Or, coming to the actual requirements of this case, it cannot be said that it was the intention of the parties that, if no such attempt was made, said right should not be assignable to the purchaser. No such attempt was made. The contract on the part of the receiver was in reality the contract of the court. Judge Love, in the case of Farmers' L. & T. Co. v. Central R. of Iowa (C. C.) 7 Fed. 537, said:

"Receivers are like public officers who are not individually responsible upon their official contracts, nor for torts committed by their subordinates, but only for torts committed by themselves, or contracts on which they assume to bind themselves personally."

Mr. Justice Brown, in the case of McNulta v. Lochridge, 141 U. S. 327, 12 Sup. Ct. 11, 35 L. Ed. 796, said:

"Actions against the receiver are in law actions against the receivership, or the funds in the hands of the receiver, and his contracts, misfeasances, negligences, and liabilities are official, and not personal, and judgments against him as receiver are payable only from the funds in his hands."

The proper attitude of a court towards receiver's obligations, duly authorized, is thus stated by Judge Brewer in the case of Farmers' L. & T. Co. v. Burlington S. W. Ry. Co. (C. C.) 32 Fed. 805. He said:

"The court should be chary of promise, but eager of performance; careful not to burden property in its possession with obligations, and equally careful to see that every obligation is discharged before possession is fully surrendered."

This was the attitude which the lower court in said suits maintained toward said contract of construction. In its decree of sale and order of confirmation it is provided that the purchaser and his assignee should carry out and perform said contract, and, not only this, but it reserved the power to thereafter order a compliance with said contract on their part, and to retake and resell the property for that purpose, and the purchasers and their assignees took the property subject to such reservation. As to the effect of such reservation, Judge Love said, in Farmers' L. & T. Co. v. Central R. of Iowa, supra:

"If the receiver had been discharged, and the property turned over to the new company unconditionally and without reservation, I am at a loss to see what legal remedy claimants, without established liens, would have. But the court did not in this case so turn over the property. It would have been a most unwise and unjust proceeding to have done so, leaving just claims and liabilities incurred by a receiver of its own appointment, without any provision whatever to enforce them. On the contrary, this court, in the final

decree of May 20, 1879, retained here the case of the Farmers' Loan & Trust Company against the Central Railroad Company of Iowa and others, and in express terms reserved its jurisdiction of said cause to enforce the payment of debts and liabilities incurred by its receivers. For this purpose, at least, that suit has never been dismissed. It is still pending, and any claimant with a demand against the receiver, which he has a right by law to have established as a lien against the railway property, may, by leave of the court, intervene in the foreclosure cause and assert his claim. It is not necessary that the plaintiff should make new parties to his petition. He intervenes in the old chancery case, which is still pending. He asserts his right to a lien upon the property which the court turned over with a reservation of jurisdiction to hear and determine his cause."

It follows from this that, after the sale of the property and delivery thereof, and assignment of said contract to the defendant in error, assignee and vendee of the purchasers, the construction company had the same security for payment of the moneys which would become due to it under the contract that it had before. The assignment of the contract of construction to the defendant in error amounted, therefore, to no more than an assignment of the right to have the construction company perform its obligations arising therefrom, and to recover damages for failure to do so, and of the privilege of having its said employés supervise and estimate the work as stated.

The contract contained a clause by which it was provided that the receivers might at any time, without fault on the part of the construction company, and for any reason that might appear sufficient to them, upon 10 days' notice to it, cancel the contract, in which event it should be entitled to the full amount of the estimate for the work done by it up to that time, without deduction, and not be entitled to any damages on account of the cancelment. Counsel for plaintiff in error contend that this clause evidences an intention of the parties that the right to have the contract completed should not be assignable by the receivers to the purchasers, in the event of a change in the title and possession of the property, because of a sale before its completion. We do not think that any such effect can be given to it. It did not provide that upon a sale the contract, though uncompleted, should be annulled. It simply conferred upon the receivers the right, for any reason appearing to them sufficient, to annul the contract in the course of its execution. If they did not see fit to exercise that right, the contract was to be completed. There is no ground for saying that a sale of the property was to have any special bearing upon the exercise of this right.

The conclusion in regard to the construction contract must, therefore, be that it certainly does not evidence an intention that the right which it conferred on the receivers to have the work provided in it performed by the construction company should not be assignable to the purchaser in the event of sale before its completion, and that there is strong reason for holding that it shows affirmatively that it was within the contemplation of the parties thereto, and their intention, that it should be so assignable. If, then, there was any intention on the part of the parties to the guaranty bond that the right of the receivers to have the obligation created by it performed should not be assignable, it must be found in its terms or nature, considered as stated aforesaid. It is certain that it was their intention that it should not

be assignable apart from the construction contract. Was it their intention that it should not be assignable along with the right to have that contract performed in the event of a sale of the property with which it had to do before its completion? There was no express stipulation that it should not be. Was there anything in the nature of the bond which evidenced such intention? Upon the idea that there was, counsel for plaintiff in error cite a number of cases in which guaranties have been held not to be assignable. They involve mostly guaranties, which are often termed letters of credit and guaranty payment of future advances, credits, sales, or payments. The following cases cited by them involve guaranties of this kind, to wit, Holmes v. Small, 157 Mass. 221, 32 N. E. 3; Daube v. Philadelphia C. & I. Co., 77 Fed. 713, 23 C. C. A. 420; Penoyer v. Watson, 16 Johns. 101; Evansville Bank v. Kaufmann, 93 N. Y. 273, 45 Am. Rep. 204; Crane Co. v. Specht, 39 Neb. 123, 57 N. W. 1015, 42 Am. St. Rep. 562. To this class of cases belongs the case of King v. Batterson, 13 R. I. 117, 43 Am. Rep. 13, not cited by them. The ground upon which such guaranties are held nonassignable is thus stated by Judge Potter, who delivered the opinion of the court:

"Ordinarily a guaranty is not negotiable. It may, indeed, be made so, if such appears to be the intention of the guarantor. It may not be addressed to any particular person. It may be an offer addressed to all the world, as in case of a reward offered. But, if addressed to a particular person, as in this case, we think it cannot be transferred so as to enable another to sue upon it in his own name. There may be good reasons why the guarantor should be willing to deal with one person, and not with another; there may be equities or other dealings between the guarantor and guarantee which the former may desire to provide for."

He said further:

"But when the contract is such as to imply peculiar confidence in the honesty, pecuniary ability, knowledge, or skill of the person to whom the guaranty is addressed, there is good reason for holding it to be strictly personal, unless its language implies the contrary."

They cite other cases involving guaranty bonds or contracts of that nature that were held not to be assignable, because, for them to have been so would have permitted one party to the contract to change a term thereof other than the person who is entitled to performance as well as that term. They are the cases of Thompson v. Young, 2 Ohio, 334; Bensinger v. Wren, 100 Pa. 500; Burgett v. Paxton, 15 Ill. App. 379.

In Thompson v. Young, the surety on a bond for the fidelity of a cashier was held not liable for the cashier's defalcation after the bank's charter was extended, and in Bensinger v. Wren the surety on a bond for the fidelity of the cashier of a private banking association was held not liable for the cashier's defalcation, after the association had been merged into an existing corporation chartered as an insurance and trust company, to the assignees of such corporation for the benefit of its creditors. The bond in the one case was to cover the acts of the cashier whilst such officer of the then existing bank, and in the other case as cashier of the then existing private banking association. There was no agreement in either case to answer for his acts as cash-

ier of another institution. In Burgett v. Paxton it was held that the surety in an injunction bond given to obtain an injunction restraining the sale of land under execution brought against the sheriff and judgment creditor was not liable to the assignee, after suit brought, of the judgment creditor, made a codefendant with the sheriff and said creditor on his own petition, no new bond being given, for the damages which he, the assignee, had sustained by reason of said injunction in a suit brought after its dissolution by the sheriff and original judgment creditor for themselves and for the use of the assignee of the judgment. It was so held because the bond was construed to cover by its terms only the damage which the original plaintiff might sustain by reason of the injunction. To permit a recovery of the damages which the assignee had sustained would be to enlarge that term of the bond.

In the case of First National Bank of Quincy v. Hall, 101 U. S. 43, 25 L. Ed. 822, cited by them, the question involved was not whether the party who was entitled to performance of the contract of guaranty (the guarantee) could assign the right, but whether the party who was under the obligation of performing it (the guarantor) could shift the duty of so doing to another. It was claimed that a firm composed of three at Chicago had guarantied payment of drafts drawn on them by their agent at Quincy, conditioned upon stock to meet the drafts being in transit the same day or day after they were presented, to a bank at the last-named place, if it should advance money on them, and, drafts so drawn and advanced upon, against which no stock had been shipped, having been paid by the firm, it brought suit against the bank to recover the money so paid. Between the making of the alleged contract and said advances, there had been a change in the membership of the firm by the admission of two new members without the knowledge of the bank, and after the transaction complained of. It was held that no recovery could be had because of this fact. It was in this sort of a case that Mr. Justice Swayne said:

"The proof is conclusive that the bank had no knowledge of the change until after the commencement of this suit. The alleged cause of action arose more than eight months after the new partnership was formed, and nearly a year after the date of the letters by which the contract is claimed to have been made. There was no privity between the bank and the new firm. There was no binding acquiescence by the bank. There could be none without knowledge, and it is not claimed or pretended that such knowledge existed. A new party could no more be imported into the contract and imposed upon the bank, without its consent, than a change could be made in like manner in the other pre-existing stipulations. The bank might have been willing to contract with the firm as it was originally, but not as it was subsequently. At any rate, it had the right to know, and to decide for itself. Without its assent, a thing was wanting which was indispensable to the continuity of the contract."

Then as to the case of Dupee v. Blake, 148 Ill. 453, 35 N. E. 867, cited by them. That was a case where an attempt was made to change the person whose fidelity had been guarantied, without the consent of the guarantor. It was there held that a surety who guarantied the performance of certain conditions by a firm is not liable for the default of the firm after it has been changed by the addition of a new member. Judge Magruder said:

"A party may be induced to become surety for the individuals who compose a firm because of his confidence in their integrity, prudence, accuracy, and ability as business men, but he cannot be presumed to have intended to become responsible for the possession of such qualities by some third person, who may be afterwards taken into the firm without his knowledge or consent. It is often in the power of one partner by want of discretion or integrity to ruin another."

This case is certainly no authority in support of the contention for which it is cited.

Now, the case in hand is like all the cases so cited which have been so far considered in that the contract involved herein is a guaranty contract. In no other respect, though, is it like them. No attempt was made by the assignment relied on to change the obligor or any term of the contract other than the person entitled to the performance, and the amount of liability did not depend upon the future to any further extent than it would be affected by the action of the employés of the party entitled to the performance of the principal contract in the exercise of their liberal powers as to directing, changing, and estimating the work. It is the case of a guaranty of a contract already made, and within the knowledge of the guarantor at the time he signed the contract. It is a guaranty that, except as stated, is absolute in its terms, and definite as to amount and extent. It is held, in relation to absolute guaranties, in the state of New York, that they will pass by an assignment of the principal contract, without more, as an incident thereto. Craig v. Parkis, 40 N. Y. 181, 100 Am. Dec. 469; Claflin v. Ostrom, 54 N. Y. 581.

Counsel for plaintiff in error urge further that the bond in suit is an insurance contract, and is for this reason nonassignable. It is true that contracts of the kind involved herein have been held to be insurance contracts; i. e., contracts insuring a guarantee against loss by reason of want of fidelity of an employé or the nonperformance of a contract. It was so held in the cases of Jackson v. The Fidelity & Credit Co., 75 Fed. 359, 21 C. C. A. 394; Guaranty Co. v. Mechanics' Bank, 80 Fed. 766, 26 C. C. A. 146; Am. Credit & Ind. v. Athens Woolen Mills, 92 Fed. 581, 34 C. C. A. 161; American Surety Co. v. Pauly, 170 U. S. 133, 18 Sup. Ct. 552, 42 L. Ed. 977; Guaranty Co. v. Mechanics' Bank, 183 U. S. 419, 22 Sup. Ct. 124, 46 L. Ed. 253. But the sole effect given to this consideration in those cases was to apply to such contracts the general rules of construction applicable to ordinary insurance policies. Companies like plaintiff in error, being in the business of guarantying for profit upon contracts whose provisions are prepared by themselves, those provisions are construed most favorably to the insured. No other effect has heretofore been given to the fact that these contracts are in their nature insurance contracts. Should that circumstance be given in this case the effect of rendering the guaranty bond sued on herein nonassignable? Not unless nonassignability is of the essence of an insurance contract. It is true that ordinary fire insurance policies are held to be nonassignable. This, however, is due to some extent to an element of trust in such a contract on part of the insurer in the insured, and also to the fact that, accompanying a sale of the property, for them to be assignable without an express provision to that effect would be to permit

124 F.—56

the insurer to change a term of the contract without the consent of the insurer, which term is other than the person who is entitled to the performance, to wit, that term which provides that it is the insured's interest in the property which is covered by the contract. The law as to the assignment of fire insurance policies is thus stated in Joyce on Insurance, vol. 3, § 2304:

"A policy of fire insurance is a personal contract, and, in the absence of the consent of the insurer, it cannot be assigned so as to permit the assignee to sue thereon in his own name. The contract is that the insured shall sustain no damage to the extent of the amount named in the policy, and, though it is an insurance on the property, still it does not pass with the sale thereof, and it is considered only as a contract of indemnity to the person named in the policy."

But the law is not so as to life or marine insurance policies. As to life insurance policies, the law is thus stated in Joyce on Insurance, vol. 3, § 2346:

"The rule that fire policies cannot be assigned without the consent of the insurer does not control in the assignment of policies of life insurance. * * * With the gradual extension of the principles controlling choses in action, courts of law now recognize an assignment thereof to the extent of vesting the assignee with an equitable interest and permitting him to recover for his own benefit in the name of his assignor."

And as to marine insurance policies the law is thus stated in Joyce on Insurance, vol. 3, § 2350:

"The strict rules controlling the assignment of policies of fire insurance do not prevail in the assignment of marine policies. The latter is not distinctly a personal contract, as is a fire policy. * * * The reason for the distinction between fire and marine policies is due to commercial necessities and convenience, and the fact, as we have stated above, that mere personal consideration is not such an important factor in marine policies."

There is nothing, therefore, in the nature of the bond in question, which renders it nonassignable. It is a guaranty of the performance of a contract, which does not simply contain no evidence that the right to have it performed shall not be assignable, but shows that it was within the contemplation and intention of the parties, could, and in all probability would, be assigned before the time for its completion would arrive. It must be held that it was equally within the contemplation and intention of the parties to the guaranty bond that it should be assignable along with the principal contract. And as to the liberal powers conferred on the employés of the party entitled to the performance by the construction company, hereinbefore referred to, the contract did not provide for the selection of any particular persons, but left that entirely to the receivers. They had the right to change them as they saw fit. Such provisions are usual in such contracts. We do not think that the element of confidence and trust contained in those provisions is sufficient of itself to warrant the conclusion that it was the intention of the parties either that the construction contract or the guaranty bond should not be assignable. And as a matter of fact the persons who held those positions under the receiver were continued therein by the plaintiff during all the time that the construction company was at work under the contract.

The result of our consideration of the question as to the assignability of the bond sued on is that we must hold that it was assignable.

(b) The other question involved in the refusal to give the peremptory instruction asked for, and thereby decided adversely to defendant's contention, was as to whether or not the construction contract provided a remedy for its breach by the construction company, which was other than an action to recover damages, and was exclusive. Counsel for plaintiff in error state that the construction contract contained a clause providing that, in case the construction company should not, in the judgment of the engineer of maintenance of way, well and truly, from time to time, comply with and perform all the terms and provisions therein stated and stipulated on its part, in manner and form and within the time therein mentioned, or in case it should appear to said engineer of maintenance of way that the work did not progress with sufficient speed, or in case of interference with said work by legal proceedings instituted against the construction company by other parties than the receivers, the engineer of maintenance of way should have power to annul the contract, if he saw fit to do so, by serving notice in a certain manner. They state that it further provided that upon the serving of said notice "this agreement, and every clause and part thereof, shall become null and void, and the unpaid part of the value of the work done shall be forfeited by the said contractor to the use of said receivers, in the nature of liquidated damages." It is the remedy thereby provided which they claim was exclusive. In support of their contention that it was they cite the following extract from the opinion of Judge Cooley in Friedland v. McNeil, 33 Mich. 40, to wit:

"It may be questionable whether the provision in the contract authorizing them, after three days' notice, to take the work in their own hands, and complete it at the contractor's expense, is not to be regarded, when acted upon as a remedy agreed upon, as a substitute for future damages."

And the following extract from the opinion of Judge Lewis, in O'Connor v. Bridge Co., 95 Ky. 633, 27 S. W. 251, 983, to wit:

"In our opinion, the Henderson Bridge Company has no cause of action against O'Connor et al. by reason of their alleged failure to progress with the work according to an agreed program, or failure to comply with the contract in any respect. The remedy provided for the company in case of noncompliance with the contract by the contractors, and manifestly the only remedy contemplated by the parties was the right to annul the contract in either one of the three conditions stated therein, and in one of them to have the unpaid part of the earnings forfeited."

But the concluding portion of said alleged clause, providing what shall be the effect of the engineer of maintenance of way serving the notice therein provided, and which portion we have given within quotation marks, is not contained in the printed record or original transcript. The sole authority we have for its existence is the statement of counsel for plaintiff in error in their brief, not denied by counsel for defendant in error. This omission is sufficient in and of itself to dispose of this contention of counsel for plaintiff in error, but, in order to relieve from apprehension that serious harm may have been done by this omission, we deem it proper to go further, and say that the point is not well taken. It may be that, even if this clause did provide an exclusive remedy in so far as the construction contract

was concerned, that the right to sue on the guaranty bond would not be affected. And the fact that a guaranty bond was taken is quite persuasive that the remedy thereby provided was not understood to be exclusive; for, if so, why was the guaranty bond taken at all? But, coming to counsel's contention, the remedy thereby provided was not exclusive. It was entirely optional on the part of the engineer of maintenance of way. He was given power in either of the contingencies stated, if he saw fit to do so, to annul the contract. He was not bound to do this. Of course, if he exercised this power, and annulled the contract, then it might be said that the sole remedy left was that contained in the latter part of the clause omitted from the record as before stated. In the extract from Judge Cooley's opinion, quoted above—from counsel's brief—it is said that the remedy therein referred to might possibly be regarded as a remedy agreed upon as a substitute for future damages "when acted upon." And it is only in that contingency that it is considered that said remedy might be such a substitute. In the Kentucky case relied on the clause considered seems to have been substantially the same as that in question herein. But there the power conferred had been exercised, and the contract annulled, and it was only in view of that fact that the court held that the remedy provided was exclusive. It held, not that it was originally exclusive, but had become so by action taken under it. In this case no action looking towards an annulment of the contract was ever taken. In the original petition it was alleged that the engineer of maintenance of way did exercise this power; but this allegation was, in effect, withdrawn by an amended petition, and it was alleged that the defendant abandoned the work, and because of this abandonment plaintiff was compelled to complete it.

(c) Counsel for plaintiff in error claim that still another question was involved in the refusal to give the peremptory instruction, and was decided by it against their contention, and that, therefore, that ruling was erroneous. It grows out of the following facts, in addition to those that have already been stated: The contract between the receivers and the construction company, as heretofore stated, called for work to be done by the latter at two distinct places—one between Cochran and Milan, in Indiana, and the other at Skillet Fork, near Iuka, in Illinois. The construction company agreed to raise an iron bridge and wooden trestles at the latter place, in addition to changing and preparing the grade, and that without other compensation therefor than what it was to receive for excavation done in connection with the grading. Before the contract was entered into, the company was furnished with plans and specifications of the work to be done at that place, on which to make calculations for its bid. The contract contained a provision by which the receivers retained the right to change, at any time during the progress of the work, the alignment grades and widths of the road, or any part thereof, and also the limits of the sections, or to alter the character, vary the dimensions, or change the location of structures, or substitute one kind of material for another, or to omit entirely, when found necessary, or to require to be built where not then contemplated, without the contract prices per unit being thereby affected. In June, 1899, whilst the work was

progressing in Indiana, and before any work was done in Illinois, new plans and specifications for the work to be done in the latter state were furnished the company by the receivers, and it was required by them to do the work there in accordance therewith.   These plans and specifications called for less excavation and for raising the iron bridge and trestles to a greater height than called for in the original ones. The receivers claimed that they had the right to make this change by virtue of the provision aforesaid.   The company disputed this claim on the ground that the proposed change was such a material and radical one, that it was not within the contemplation of the parties when the contract was made, and it refused to and did not do any work in Illinois.   After it ceased working at all, plaintiff did the work there according to said new plans and specifications, and part of the damages sued for in the action below was the difference between what it cost to do that work and the contract price, amounting to about $7,000.

Counsel for plaintiff in error contend that said change was a material one, and not within the contemplation of the parties when the contract was made, that the construction company, by reason thereof, was not only justified in refusing to go on with the work at Skillet Fork, but would also have been justified in abandoning the work in Indiana, and that, therefore, it was released from further liability on its guaranty.   The question as to whether this position is correct, is the further question which they contend was involved in and erroneously decided by the refusal to give the peremptory instruction. But this ruling, in so far as it relates to this question, was right, for the reason, if none other, that the court could not say, as a matter of law, that the conceded change that was made in the plans and specifications as to the Illinois work was a material one, and not within the contemplation of the parties when the contract was made.   That was a question of fact to be determined by the jury, if it was true that the consequences claimed would indeed follow from it.   For this reason, also, that ruling did not involve the question as to whether those consequences would follow if that fact was as counsel for plaintiff in error claim it to have been, and was not disposed of by it.

2. Other rulings are assigned as error on the ground that they involved this question, and disposed of it contrary to their contention. They are as follows:

At the close of all the testimony, defendant moved the court to exclude from the jury all evidence in relation to the work in Illinois. This the court refused to do.   It requested the court to charge the jury that, if they found from the evidence that the change made in said work "materially decreased the profit to be derived" by the company, and were "a departure from the plans" upon which it made its bid and entered into the contract, it was "justified in refusing to do the work as so changed, and in abandoning the same."   This charge it refused to give, but it was given substantially in other words.   The jury were told that, if they found from the evidence that the change was "a radical departure from the plan, which would materially reduce the chances of profit, which the contractor had a right to expect, or involve loss to him," it was "an unreasonable exercise" of the discre-

tion which the receivers had to make changes, and they should not find for the plaintiff anything on account of the increased expense it was put to in doing said work. These three rulings, to wit, the charge of the court, the refusal to charge as requested, and the refusal to exclude said evidence, were duly excepted to, and are so assigned as errors. It is hard to see how plaintiff in error can complain of said charge. It is substantially that requested by it, and under it the jury seems to have found in favor of defendant, for it is agreed by counsel for both parties that the amount of the verdict shows that this is so. Nor can it complain of the court's refusal to give the charge requested by it, because it gave it in other words. Then as to the refusal to exclude said evidence. For it to have done so would have been to have decided as a matter of law that said change was material, and not within the contemplation of the parties, and therefore plaintiff was not entitled to recover any damages on account of that work. But these rulings did not involve the question as to whether, if said change was material, and not within the contemplation of the parties, the construction company would have been justified in refusing to go ahead with the Indiana work, and defendant was released from further liability on its guaranty. They simply involved the question whether, if such was the case by reason thereof, the defendant was justified in abandoning the Illinois work, and no damages could be recovered on that account.

3. There was a ruling, however, that may be said to involve this question, and dispose of it adversely to defendant, which was duly excepted to by it, and has been assigned by it as error herein by plaintiff in error. It was the refusal of the court to give this request to the jury, to wit: "I charge you that, if you find that there was any material alteration of the original contract, you must find for the defendant." Assuming that this ruling does involve, and so dispose of, this question, was it or not properly decided? At the outset we are met with the suggestion of counsel for defendant in error that defendant had no right to raise this question in the lower court, because it had not pleaded said change as affecting plaintiff's right to recover for the damages which it sustained by reason of the construction company's failure to complete the work in Indiana. It is claimed that it is pleaded only as a justification for the abandonment of the Illinois work, and as affecting plaintiff's right to recover damages for said company's failure to do the Illinois work. There is some basis for this contention in relation to the amended answer, and it is possible that a fact pleaded, though it is entitled to have a greater effect given to it, should be limited to the effect claimed for it in the pleading. But, however this may be, said change, as pleaded in the amendment to the amended answer, was not limited, and at any rate we will assume that the question is properly before us, and dispose of it on its merits, as we are of the opinion that from that standpoint the position is not well taken.

The contract contained a provision to the effect that, if the receiver should determine to build bridges, culverts, walls, or other masonry, or do other work not therein enumerated, on the said section or sections, the company would perform, build, and complete the same as

though it had been enumerated, and for the price stipulated to be paid for similar kinds of work, and upon the same terms and conditions, except as to time of completing the same, to be extended at the discretion of the engineer of maintenance of way, and further in these words: "The engineer of maintenance of way may, at his discretion, annul this contract as to any one or more sections of the work, without releasing the contractor from his contract on other portions of the work." Under this provision the engineer of maintenance of way had the power to annul said contract as to the work in Illinois entirely, and the exercise of that power would not release the company from its obligation to do the work in Indiana. It is not contended otherwise by counsel for plaintiff in error. Their position is that the engineer of maintenance of way did not exercise that power. Within the meaning of that provision nothing can be said to amount to an annulment of a portion of the contract that was not intended to have that effect. What the engineer of maintenance of way did in the particular in question was not so intended. He claimed that the change made in the plans and specifications was within the right retained to make changes, and hence that the company was bound to do the work in accordance therewith under the contract, and he and the receivers and their successors have at all times since maintained the position that he was so bound; and part of the damages sought to be recovered was for the increased cost of doing the work over and above the contract price. But though what the engineer of maintenance of way did was not intended as an annulment of that much of the contract, if the position of plaintiff in error is correct, it was, in effect, an annulment. It claims that the requirement to do the work according to the new plans and specifications was a material alteration of the contract, and because it was such the construction company was released from further obligation, not only to do the work in Illinois, but also in Indiana. A material alteration of a contract is a destruction of the old provision in the matter altered, and an attempt to foist a new provision on the other party to the contract. Certainly a party to a contract is not released from an obligation to perform some provision in it because the other party has attempted a material alteration of another provision therein, when he has power under the contract to annul that provision altogether. If he had gone no further than to annul that provision altogether, no release would have taken place, but because he has gone further, and attempted to substitute another provision in its place, a release takes place.

We cannot assent to this proposition. Nor do we think it makes any difference that the party is not conscious that he is making a material alteration, and does not intentionally do so. The position is that because he was not consciously and intentionally making a material alteration, a release takes place. The matter should be considered from the standpoint of the ground upon which the release is claimed; i. e., there has been a material alteration. Though a material alteration should otherwise be a ground of release, it should not, where the party making the alteration has the power to annul the provision attempted to be altered, and that irrespective of the question whether he is consciously and intentionally making it.

4. The court was requested to charge the jury that "a failure on the part of the railroad company to make a payment of a monthly estimate at the time specified is a breach which justifies the abandonment of the work by the contractor." And, again, that "any wrongful withholding of a part of a monthly estimate by the railroad company, when due the contractor, amounts to a failure to pay the same, and justifies an abandonment of the work by the contractor." The court refused to so charge the jury. The court did charge the jury that:

"The failure to perform some provision of the contract, unless accompanied by acts indicating an intention on the part of the party in default to renounce and abandon the contract, would not justify the other party in renouncing and abandoning it. Failure to pay the estimate at the time would not justify the Globe Construction Company in abandoning the contract unless it was accompanied by conduct that would indicate that the railroad company itself was renouncing the contract."

The defendant excepted to the ruling of the court in refusing to give to the jury each of the requests so made by it, and in so instructing the jury and these rulings are assigned as errors.

Counsel for plaintiff in error contend that the defendant in error failed to pay the estimates for November and December due under the contract December 10th and January 10th, and withheld from certain, if not all, of the other estimates certain illegal charges; that this conduct on its part would have justified the construction company in abandoning the contract entirely; and that, therefore, though it did not abandon the contract on either account, but because of inability to go ahead, there was no longer any responsibility on the guaranty bond. In support of their contention that the mere failure to pay a monthly estimate or wrongful withholding of a part of one to pay illegal charges would have justified the construction company in abandoning the contract entirely, they cite the following cases: Canal Co. v. Gordon, 6 Wall. 561, 18 L. Ed. 894; Phillips Construction Co. v. Seymour, 91 U. S. 646, 23 L. Ed. 341; Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12, 29 L. Ed. 366. We do not think that these cases support this contention, but, without deciding whether they do or not, or the further question as to the effect of this contention being correct on the liability on the guaranty bond, we do not think that the judgment complained of should be reversed on account of these rulings. The construction contract contained a clause providing that the monthly and final estimates should not be payable until the construction company had paid in full all persons, laborers, and subcontractors in its employ in the work, for all work done up to and including the date for which preceding estimates had been made, and give evidence of such payment by filing with either of said engineers the pay rolls receipted in full, and that the engineer of maintenance of way should have the right at any time he saw fit to pay them the amounts due them, and deduct amounts so paid from the amounts payable under said estimate. The estimates for November and December were not paid because of numerous unpaid claims of such persons. The evidence was undisputed as to this. The court, however, in connection with that portion of its charge last referred to above, called the jury's attention to said clause of the contract, and left it to them to determine whether said estimates were withheld to pay hands, and, if

they were, such withholding would not have been a breach of the contract.

So far as the claim of wrongfully withholding parts of the monthly estimates on account of illegal charges, there was no such withholding, as will be shown when we come to consider the other class of rulings complained of.

Then as to the rulings which involved questions affecting the amount of recovery which have been assigned as error.

1. The permitting plaintiff's witness H. Devereux to testify as to the estimates made by him, and admitting those estimates in evidence. The ground upon which it is claimed that this evidence was not competent is that under the contract Devereux was not the proper person to make those estimates. The contract provided that the monthly and final estimates of the work to be done thereunder should be made by the engineer in charge of construction, should be subject to revision and correction by the engineer of maintenance of way, but should otherwise be final and conclusive. Devereux's title was resident engineer. With assistants and a force of hands under him, he had immediate charge of the work of construction in Indiana, and the estimates made and testified to by him were as to this work. He had nothing to do with the Illinois work which the construction company refused to do, and which was done by plaintiff after it abandoned the work, and made no estimates in regard thereto. They were made by the resident engineer in whose district that work lay, and who had immediate charge thereof. Over those two engineers was another officer, whose title was engineer of construction, who had general supervision of all the work of construction on the Mississippi division, extending from Cincinnati to East St. Louis, and who in turn was under the engineer of maintenance of way. The estimates made by the resident engineer were made under immediate supervision of the engineer of construction, and were approved and so indorsed by the engineer of maintenance of way. We are of opinion that said estimates were properly admitted in evidence. If the resident engineers were not the engineers in charge of construction within the meaning of the contract, the estimates made by them should be considered as made by the engineer of construction. But plaintiff in error is not in position to complain here of the admission of said estimates in evidence and permitting Devereux to testify in regard thereto. All of the estimates for the work done at both places from the beginning until the completion thereof were identified and read in evidence when the engineer of maintenance of way, who testified before Devereux, was on the stand as a witness; and they were allowed to be so read in evidence without objection. And when Devereux testified he was permitted to state that he made the estimates for the Indiana work, and that the monthly estimates were reasonably correct, and the final one correct, without objection. The only objection made was as to his being permitted to give a description of the final estimate.

2. Certain rulings which involve the question whether, under a provision of the contract that the receivers should transport over their railroad all materials used in construction at the rate of three mills per ton for each mile the same should be transported, required the

plaintiff to transport such materials to the place where same was intended to be used at that rate, or only to the nearest railroad station or side track. The court decided that it only required the latter. There was nothing said in that provision as to the place where same was to be delivered when so transported. It was silent on that subject. There was another provision by which the receivers bound themselves to transport over the railroad the employés, tools, and equipment needed for the work of construction, once each way, free of charge; but it expressly stated that the place to and from which the transportation was to be made was "the place where the said second main track and change of grade is to be constructed." The construction company billed all its material used for construction to the nearest station where needed whilst it was at work, and was charged the contract price therefor, to wit, three mills per ton. From that point to the place where needed it was transported by a work train hired by it from the receivers and plaintiff, used also for other purposes in connection with the work of construction. The construction company was charged by them a certain price per day for the engine and crew used upon this work train, and this, together with the charges for transportation to the nearest station, were deducted from the monthly estimates rendered, and paid to the construction company before it abandoned the work. These same charges were made thereafter as a part of the cost of construction in completing the work. It was inconvenient, if not practically impossible, to get the material, such as heavy stone, to the place where used, in any other way by the railroad. We think that the court's construction of this provision was correct.

3. The ruling in the original charge to the jury in regard to redressing the embankments between Cochran and Dillsboro, a distance of about six miles, the embankments covering about one-half of that distance. The contract provided that cuts and embankments should be dressed up in a thoroughly workmanlike manner, brought to the true subgrade, and the drain ditches in cuts neatly and evenly finished, as the engineer in charge of construction might require, and that the construction company should not receive compensation for such dressing and finishing up of the work, as the price paid for excavation should cover that cost. Said company dressed said embankments, and brought them to a grade even with the top of the ties of the main track. Evidence was introduced by defendant to the effect that said company so did by direction of Devereux, the resident engineer, the evidence of plaintiff being to the contrary. After these embankments were so dressed, the engineer of construction required them to be redressed to a grade even with the bottom of the ties, and, upon the construction company refusing so to do without extra compensation, the plaintiff put in a force of Italians to so redress said embankments, and the construction company, with its force, thereafter assisted in this work. The money expended by plaintiff in this work was deducted from the monthly estimate succeeding, and in making up the damages sought to be recovered it was put in as a part of the cost of construction. The court instructed the jury in its original charge as follows:

"If the Globe Construction Company's version of this matter is true, and if it involved a loss to the Globe Construction Company, the loss does not enter into the present account, and cannot be stricken from the account. There is nothing here in pleading in the way of counterclaim or recoupment, and I am unable to see how it could be credited upon this account, if any should be found."

This is the ruling complained of herein. But this is not the entire charge of the court on this subject. The jury were recalled, and charged in substance that, if the resident engineer required said embankments to be leveled up to the top of the ties of the main track, and the engineer of construction thereafter required it to be reduced to the bottom of the ties, the subgrade, the amount which plaintiff had paid to the Italians should be deducted from plaintiff's account. To this charge no exception was taken. It is true that it has no reference to the expense which the construction company incurred on this account, in so far as its force was engaged in the redressing. This, however, should have been made the ground of a counterclaim or recoupment, if it could have figured in the case at all, and was not so made.

4. The admission in evidence of a certified copy of the record in a suit brought by certain subcontractors of the construction company in an Indiana state court against said company and plaintiff, in which suit said subcontractors obtained judgment for the amount of their claim, costs, and a $20 attorney's fee, which judgment was subsequently paid by plaintiff, and the amount paid charged as part of cost of construction. The contract provided that the final estimate should be payable upon the construction company's giving a release, under seal, of all claims and demands whatsoever growing in any manner out of the agreement. The ground upon which it is claimed that this record was inadmissible is that the construction company was not served with process in said suit, and plaintiff in error was not a party thereto. We do not think that the point is well taken; but, whether so or not, it must be considered to have been waived by the agreement of the parties hereto; that said record should be omitted from the transcript, which has been done.

5. The refusal to permit certain witnesses of plaintiff to answer certain questions asked on cross-examination in regard to the original estimates put upon the work to be done by the receivers and amount of money appropriated therefor. They were so asked with the view of showing that the cost exceeded those estimates, and thereby the officers of plaintiff had a motive to treat the construction company unfairly in their classification and estimation of the quantity of the work done by it, and subsequently by plaintiff. The evidence was too remote, and the action of the court proper.

6. The refusal to permit Col. C. B. Childe, an old civil engineer of much experience in railroad construction, to testify as to the proper classification of the material removed from Spellzhaus' cut—work done by plaintiff after the construction company had abandoned the work. Col. Childe had not seen the material removed either before, during, or after its removal. He had seen the cut a short time before the trial, and with a view to testifying. The opinion which he was asked to give was drawn from an inspection of the sides of the cut at

this time. In response to one question he stated that as much as 90 per cent. of the material so removed should be classified as loose rock, and this opinion was excluded, and he was not allowed thereafter to give an opinion as to how it should be classified. The contract divided material into three classes—earth, loose rock, and solid rock—and provided what should constitute each. The price to be paid differed as to each, being lowest for earth, and highest for. solid rock. The provision as to loose rock contained this clause: "When loose rock, as here specified, is handled by a steam excavator, although blasting may occasionally be resorted to, it will be considered and classified as earth excavation." By virtue of this clause what would otherwise be classified as loose rock should be classified as earth excavation if handled by a steam excavator. The actual way in which the 'loose rock was handled, therefore, determined its classification. In view of this, if the opinion of an expert civil engineer as to how material removed from a cut should be classified, formed from looking at the sides of the cut long after the removal of the material, is ever competent, it was not competent in this case.

7. The ruling of the court in regard to interest. The court, in its charge, had said nothing on this subject. At its close a juror asked in regard to the matter. The court stated that the plaintiff claimed interest from the 1st of December up to the first day of the then term of court. The defendant excepted to this statement. The court then said: "The court has simply said, with reference to interest, that so much is claimed, and the jury will determine from the facts how much should be allowed." No exception was taken to this, and plaintiff in error is now in no position to complain of it. If it desired a more definite charge on the subject of interest, it should have requested it. T. & P. Ry. Co. v. Cody, 166 U. S. 606, 616, 17 Sup. Ct. 703, 41 L. Ed. 1132.

Perceiving no error in the proceedings of the lower court, its judgment must be affirmed.